Bruce I. Afran
**BRUCE I. AFRAN, ESQ.**
10 Braeburn Drive
Princeton, NJ 08540
Telephone : (609) 924-2075
Facsimile: (609) 924-1045

Carl J. Mayer, Esq.
**MAYER LAW GROUP LLC**
66 Witherspoon Street, Suite 414
Princeton, NJ 08542
Telephone:  (609) 921-8025
Facsimile:  (212) 382-4687

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Carl J. Mayer, on behalf of himself and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>Bill Belichick; The New England Patriots;<br>and the National Football League,<br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 07-4671 (GEB)

HON. GARRETT E. BROWN, CHIEF JUDGE

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO

## DEFENDANTS NEW ENGLAND PATRIOTS AND BILL BELICHICK'S

## MOTION TO DISMISS

# I. PRELIMINARY STATEMENT

Let's assume, as a hypothetical matter, that the New England Patriots Football organization had another special assistant (besides Matt Walsh whose job it was, according to interviews Walsh gave to U.S. Senator Arlen Specter and to the major news organizations of the nation, to steal opposing team's play calling signals using a video camera). Let's call this hypothetical special assistant Giselle, and assume that her sole job was to infiltrate the New York Jets team kitchen staff so that the night before each Patriots game she could inject a chemical substance into the food of the Jets players rendering them sluggish and unable to perform the next day. Would anyone doubt the Patriots had committed an actionable fraud on the fans/consumers?

As another hypothetical, does anyone doubt that if the Patriots, upon learning that their star quarterback Tom Brady was injured for the season, decided to start Brady's twin brother, whom we'll call Brett, but with limited football skills, as an imposter wearing Tom's number in order to sell tickets, that the Patriots would be committing a massive, and actionable, fraud upon the fans/consumers?

Apparently, defendants would consider neither scenario actionable because in their *reductio ad absurdum* no matter what the conduct of the NFL

or its constituent teams, the fans/consumers only have a "revocable license" to attend games and no consumer or contractual rights.

As defendants state:  "Here, as a matter of law, there is no contract and no relationship giving plaintiff any economically advantageous rights…Tickets are not contracts."  Def. Brief at. 7.

Not only do defendants believe that consumers have no rights, but they don't believe the law applies to them.

 "The rules governing the playing of a professional sport are not the laws of society any more than are the rules of the games of checkers or Scrabble or Monopoly."  Def. Brief at 10.

This assertion speaks volumes as the Patriots, their coach and the NFL believe they are not bound by the "rules of society."    Unfortunately for them courts have properly found that the laws of contract, fraud and consumer protection, among others, apply to them and that season ticket holders as consumers have many rights under the law.

Professional football is not – as defendants claim – like a board game.

In the real world, football fans pay thousands of dollars each every year to watch contests that are marketed to them as fair and honest competitions. If consumers want to pay to see entertainment that is fixed or rigged, they would spend their dollars on wrestling "entertainment" which has no governing body

and no rules and is explicitly billed as "Worldwide Wrestling Entertainment", not legitimate sport.[1]

Defendants want this court to believe this case is about fans suing because of a minor rule infraction and disappointed "fan expectations." NFL Brief at 4-6.

They want the court to believe that somehow the Patriots' systematic, organization-wide cheating -- conducted over a multi-year period -- is no different than the decision by an individual offensive lineman to commit a holding infraction.

This case isn't about a one-time incident or a minor rule infraction, which in any event is contemplated by NFL rules and handled by referees on the field.

This case is about fraud.  This case is about a massive, systematic organizational scheme to steal opponents' signals and cheat ticketholders of the honest contest they pay to witness.

Such pervasive cheating has consistently given the Patriots an unfair, illegal advantage over its opponents and systematically deprived plaintiffs of the right to witness football matches played fairly as advertised and according to NFL rules, which is what plaintiffs contracted for.

---

[1] www.wwe.com

4

Most importantly, this is precisely what the complaint pleads. The complaint states clearly that beginning as early as 2000 the Patriots began systematically stealing the signals of opponents, thereby giving them a decisive advantage and "destroying …the games' underlying competitiveness." Cmplt., ¶23. The complaint cites a Patriots quarterback who says that because of the illegal stealing of signals, "probably 75 percent of the time [our opponent] ran the defense we thought they were going to run." Cmplt. at ¶30. Legitimate competition is impossible in football when one team knows what the other will do 75% of the time and no fan, at least no rational fan, would knowingly pay the substantial sums demanded for tickets to NFL games to witness such a rigged spectacle.

Nonetheless, the Patriots and the NFL argue that the fans have no recourse and no rights as consumers no matter what the teams and the league do. The NFL and the Patriots don't care that the fans/consumers pay the bills.

The NFL and the teams don't care that football fans/consumers, who are almost all season ticket holders, usually pay a minimum of $4,000 per year for their season tickets. Add in parking, gas, tolls refreshments, souvenirs etc. and the American family of four is shelling out well over $5,000 per season to watch their favorite football team. These consumers do not pay up to ten percent of the median family income in America to watch games that are fixed,

altered, adulterated or consistently played against the rules so that one team has a nearly insurmountable advantage over another.

Not content with an anti-trust exemption that Congress gave the NFL, not content with the NFL's status as a tax-exempt 501(c)6 organization and not content with the myriad federal, state and local tax subsidies provided to professional football teams, the Patriots and the NFL come before this court and contend that they are exempt from New Jersey common law and the fundamental laws of contract and fraud.[2] Such a position is not tenable.

The willingness of the Patriots (and the NFL in its support of the Patriots' arguments) to throw overboard and thwart the rights of their rabid fans/consumers can only be explained by the enormous revenues the business of football extracts from its fans/consumers. The National Football League, in its 88th year, is a gigantic $6.3 billion annual business — the biggest in American sports.

---

[2] Plaintiffs would not be the first to suggest the NFL often believes it can act outside of the law.   For example, rather than report the shooting of NFL player Plaxico Burress to law enforcement officials, the NFL tried to solicit information from the police and were publicly criticized by New York City law enforcement.   N.F.L. Security – the same unit of former FBI and law enforcement agents that handles criminal incidents like the Burress matter and issues of extortion and shootings -- also handled the Patriots videotape incident. See K. Homes, "NFL Role in Burress Incident Scrutinized."  New York Times, December 3, 2008.

According to the league's business model, all 32 teams share equally the bulk of the NFL's revenue, which comes from national TV contracts and licensing deals. Home teams must pay over 40 percent of general ticket sales to their opponents on game day.  There are not only enormous financial incentives to cheat, but to conceal their cheating, since the Patriots, under the NFL business model, garner 40% of the Jets home game ticket revenue.[3]

When Robert Kraft bought the New England Patriots football team for $172 million in 1994, he inherited the worst losing record, lowest attendance, and lowest revenue in the National Football League.  Thirteen years later, the Patriots evolved into an NFL dynasty worth $1.3 billion, making them the third-most valuable team in the league, according to *Forbes*. Not only has the team won three Super Bowls and made it to the playoffs nine times in 13 years, the Patriots-owned Gillette Stadium brings in $282 million a year, with the average ticket price topping $100 — the highest in the league.[4]

If the allegations of this complaint are correct, the Patriots improbable turnaround has been built not on smarts but on illegality.  Stranger things have happened recently in many corners of American industry and courts are now

---

[3] NFL Inc., The Business Behind the Game, BNET.com, 2008.  See http://www.bnet.com/2436-13502_23-256586.html

[4] J. Alsever, The NFL's Smartest Team, BNET.com, 2008.  See http://www.bnet.com/2403-13502_23-256409.html

rediscovering (and should rediscover) the venerable body of common law and statutory principles that might bring consumers relief after a long period of capture and failure of the legislative and executive branches of government.

## II. SUMMARY OF ARGUMENT

Courts in other jurisdictions have upheld actions by season-ticket holders of NFL tickets for breach of contract, fraud, misrepresentation and violations of state consumer protection law when teams mislead or deceive customers.

Plaintiffs have adequately pled sufficient facts for each of these causes of action under New Jersey law which follows closely the common law of other states. The underlying questions of fact regarding whether there was a breach of contract, how fraud was concealed, the obligations to third party beneficiaries to a contract are all for a jury to decide and cannot be decided on a motion to dismiss.

## III. LEGAL STANDARD FOR MOTION TO DISMISS

When a claim is challenged under Rule 12(b)(6), the court presumes that all well-pleaded allegations are true, resolves all doubts and inferences in the pleader's favor, and views the pleading in the light most favorable to the non-moving party. *See Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 125 S.Ct. 1497, 1502-03, 161 L.Ed.2d 361 (2005).

In its liberality, the Rule erects a powerful presumption against dismissing pleadings for failing to state a cognizable claim for relief. *See Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.*, 203 F.3d 790, 794 (Fed. Cir. 2000) (noting that the complaint "contains enough detail to allow the defendants to answer.  Rule 12(b)(6) requires no more.")  Such dismissals are disfavored and, in view of the Rules' "notice pleading" requirements, are not routinely granted. *See Rothner v. City of Chicago*, 929 F.2d 297 (7th Cir. 1991); *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998).

The burden of proof in a Rule 12(b)(6) motion lies with the moving party. *See Ragin v. New York Times Co.*, 932 F.2d 995, 999 (2d Cir. 1991); *Yeksigian v. Nappi*, 900 F.2d 101, 104-05 (7th Cir. 1990); *Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F.Supp. 690, 692 (S.D.N.Y. 1995) (observing that Rule 12(b)(6) imposes substantial proof burdens upon the movant). *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1125 (10th Cir. 1994) (noting that federal dismissal rules "erect a powerful presumption against rejecting pleadings for failure to state a claim") (citation omitted).

The Court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir.2005).

# IV. ARGUMENT

A. <u>Count I States A Claim For Tortious Interference With Contractual Relations.</u>

The entire premise of defendants' argument is that there is no contract between a season ticket holder and a professional football team.   If that is the case, defendants reason, there can be no tortious interference with a Jets season ticket holders contract on the part of the Patriots. As defendants state:  "Here, as a matter of law, there is no contract and no relationship giving plaintiff any economically advantageous rights…Tickets are not contracts."   Def. Brief at. 7.

Defendants entire brief rests on this premise.  Because there is no contract between the New York Jets and season ticket holders, defendants assert, there can be no claim for tortuous interference with contractual relations, for third party beneficiary claims or for breach of contract or violations of the consumer protections laws.

   i.      *Whether season ticket holders have contract rights is a case of first impression in New Jersey.*

The question of whether season ticket holders to a professional sporting event have a contract is a case of first impression in New Jersey.

The best defendants can do is cite a 1912 New Jersey opinion for the proposition that customers receive only a "license" to enter a venue and do not

have a contract. Def. Brief at 7 citing *Shubert v. Nixon Amusement Co.*, 83

N.J.L. 101 (Sup.Ct.1912).  Schubert involved a gentlemen who purchased

tickets to the theatre and was removed by management even though he had a

ticket and was seated, presumably because of his race. (Although he pled the

Civil Rights Act of 1884, he did not specifically allege race discrimination.)

 The case the defendants rely on was specifically disapproved by the New

Jersey Supreme Court in *Uston v. Resorts International Hotel Inc.,* 89 N.J. 163;

445 A.2d 370 (1982):

> At one time, an absolute right of exclusion prevailed
> in this state, though more for reasons of deference to
> the noted English precedent of *Wood v. Leadbitter*, 13
> M&W 838, 153 Eng.Rep. 351, (Ex.1845), than for
> reasons of policy. In *Shubert v. Nixon Amusement
> Co.*, 83 N.J.L. 101 (Sup.Ct.1912), the former Supreme
> Court dismissed a suit for damages resulting from
> plaintiff's ejection from defendants' theater. Noting
> that plaintiff made no allegation of exclusion on the
> basis of race, color or previous condition of servitude,
> the Court concluded: In view of the substantially
> uniform approval of, and reliance on, the decision in
> *Wood v. Leadbitter* in our state adjudications, it must
> fairly be considered to be adopted as part of our
> jurisprudence, and whatever views may be entertained
> as to the natural justice or injustice of ejecting a
> theater patron without reason after he has paid for his
> ticket and taken his seat, we feel constrained to follow
> that decision as the settled law. [83 N.J.L. at 106] It
> hardly bears mention that our common law has
> evolved in the intervening 70 years. In fact, *Leadbitter*
> itself was disapproved three years after the *Shubert*
> decision by *Hurst v. Picture Theatres Limited*, (1915)

> 1 K.B. 1 (1914). <u>Of far greater importance, the</u>
> <u>decisions of this Court have recognized that "the more</u>
> <u>private property is devoted to public use, the more it</u>
> <u>must accommodate the rights which inhere in</u>
> <u>individual members of the general public who use that</u>
> <u>property."</u> *State v. Schmid*, 84 N.J. 535, 562 (1980).
> (emphasis and itals. added.)

As this final underscored sentence makes clear, the law in New Jersey is simply

<u>*not*</u> what defendants contend: that anyone selling tickets to a sporting or

entertainment event can unilaterally take the money and refuse to honor the

ticket or put on spectacles not contracted for because somehow tickets to these

events are called "licenses".   As shown above, *Uston* bluntly rejects such

reasoning.

  ii.  *Courts in other jurisdictions hold that football season ticket holders*
     *have a contract.*

  While citing a raft of cases from *other* states suggesting that some states

treat tickets to professional games as licenses, defendants fail to cite the many

cases that hold that season ticket holders possess contracts.

  If plaintiff and other Jets season ticket holders have valid contracts, then

it is a question of fact as to whether the Patriots tortiously interfered with their

contract and defendants' motion to dismiss must be denied.

  Defendants fail to cite the one case that is directly on point.   In *Beder v.*

*Cleveland Browns Inc*, 129 Ohio App. 3d 188; 717 N.E.2d 716 (Ohio Ct. App.,

Cuyahoga County 1998), appeal not allowed  84 Ohio St. 3d 1438, 702 N.E.2d

1215 (1998),  the Ohio Court of Appeals held that an action brought by a

Cleveland Browns season ticket holder against the Browns for moving the team

to Baltimore could proceed as a breach of contract action:

> "As the Eleventh Appellate District determined, we likewise find that the
> season ticket package, such as that purchased by appellants, constituted a
> contract because all the requisites of a contract were present. What
> remains to be decided is if there were genuine issues of fact regarding
> whether that contract was breached. As a threshold matter, because we
> find that an express contract exists between the Browns and appellants,
> appellants remedy is for breach of that contract…" Id. at 195.

 Such decision is far more persuasive than the ancient and now overruled

holding in *Shubert*.

Having certified a class of season ticket holders and having ruled that

plaintiffs claims in contract, fraud and violation of the Ohio consumer

protection act could proceed, the *Beder* case was settled when the Browns and

the NFL agreed to pay several million dollars to provide a fund that would give

each season ticket holder $50.   See *Beder v. Cleveland Browns, Inc*.  114 Ohio

Misc. 2d 26; 758 N.E.2d 307 (Ct. of Common Pleas, Cuyahoga County, 2001).[5]

Following the New Jersey Supreme Court's decision in *Uston*, there is

little doubt that the New Jersey courts would likewise adopt the doctrine of

---

[5]As counsel for plaintiff in *Beder* observed:  "The case signifies that sports fans
and those who patronize sports teams are consumers, and they need to be
treated the way other consumers are treated."

*Bede*r that a season ticket holder like plaintiff has a contract with the New York Jets. Leaving it as a question of fact as to whether the Patriots tortiously interfered with that contract.  See also  *In re I.D. Craig Service Corp.* (Bankr. W.D.Pa. 1992) 138 B.R. 490. (Bankruptcy court held that game tickets and the right to renew the season tickets were separate interests of the bankrupt's estate subject to ticketholders' contractual claims.)  In *I.D. Craig*, the Pittsburgh Steelers annually offered tickets to their season ticket holders of record with individual tickets, whether sold per game or in a season ticket package, stating the tickets were "revocable" licenses. However, the court in *I.D. Craig* found other evidence reflecting that for decades every registered ticketholder, referred to as the "owner" of the season tickets, automatically received an annual offer to purchase season tickets and received the tickets upon payment of the purchase price. Also, the team permitted the holder to transfer record status to another person or entity upon payment of a nominal transfer fee. *I.D. Craig, supra*. See also *In re Platt*, 292 B.R. 12 (Bankr. D. Mass. 2003); *Skalbania v. Simmons*, 443 N.E.2d 352 (Ind. App. 1982)(certifying a class action on behalf of season ticket holders who sued the Indianapolis Racers professional hockey team when the team ceased operations after only 13 of 40 home games had been played. Plaintiffs claims for breach of contract, common law fraud, tortious interference with contractual relations were allowed to proceed despite the identical

arguments raised here that the ticketholders held only a "license" with no contractual rights.)

Even were the court to accept the archaic doctrine that a ticket to a football game is a license with no contractual rights, the revocation or failure to perform duties under a license can still give rise to a breach of contract action and therefore a tortious interference action. See <u>Baseball Publishing Co. v. Bruton, 302 Mass. 54, 56, 18 N.E.2d 362 (1938)</u> ("The revocation of a license may constitute a breach of contract, and give rise to an action for damages. ")

*iii.  Plaintiffs pled all elements of tortious interference under New Jersey law.*

In New Jersey, to recover on a claim for tortious interference of contract, a party must prove (1) a plaintiff's existing or reasonable expectation of economic advantage or benefit; (2) a defendant's knowledge of the plaintiff's expectancy; (3) wrongful and intentional interference with that expectancy by the defendant; (4) a reasonable probability that the plaintiff would have received the anticipated economic advantage absent such interference; and (5) damages resulting from the defendant's interference. *Printing Mart v. Sharp Elec. Corp.,* 116 N.J. 739, 751-53, 563 A.2d 31 (1989) *Centennial Insurance Company v. Horizon Construction Co*., 2008 U.S. Dist. LEXIS 88221 (D.N.J. 2008.)

Plaintiff has pled all of these elements: 1)  that plaintiff is a season ticket holder, with all the economic cost and expected advantages that it confers. Cmplt., ¶ 2; 2) that defendants had knowledge of plaintiff's expectancy. Cmplt., ¶ 63;  3)  that defendants wrongfully and intentionally interfered with plaintiffs expectancy. Cmplt.,¶2, 59-64.; 4)  that it is probable plaintiff would have received the anticipated economic advantage absent such interference. Cmplt., ¶ 63; and 5) economic damages. Cmplt. page 25.

The economic advantage to any New York Jets season ticket holder is manifest and multiple.   Any Jets season ticket holder has to wait at least ten years on a waiting list, paying a $50 annual fee.  Once secured, the season tickets are a valuable commodity and resales of NFL tickets, it is estimated, range up to ten billion dollars on sites like StubHub, eBay, Craigslist, RazorGarot and Ticket Liquidator. [6] Jets season ticket holders, like plaintiff, also receive parking passes that are unavailable to the general public (and have

---

[6] D. Fitzpatrick, "Online Ticket Selling Goes Legit", Pittsburgh Post-Gazette, August 22, 2007. The New York Jets website, like most in the NFL, allow season ticket holders to sell tickets to the general public through "TicketExchange" which is directly linked on the website.  See nyjets.com and https://teamexchange.ticketmaster.com . Fewer than ten states in the country have laws against the resale of tickets so this market is abundant and season ticket holders have an economic benefit from owning and holding the tickets.

a high resale value), can transfer the tickets, bequeath them and are eligible for other special offers.

Once secured, the tickets confer a tangible and ongoing economic advantage, one that has been seriously diluted by the unlawful activities of defendants. To the extent that Jets ticket holders own tickets to see games played against a team that systematically violates NFL rules and cheats, their property is diminished as is their bargained for expectation in exchange for their heavy economic outlays both for remaining on the waitlist and the thousands of dollars annual cost for each season ticket.

Even if this court to rule that under New Jersey law a season ticket holder does not have express contract rights, the well-pleaded complaint alleges that plaintiff has quasi-contract and implied contract rights that were interfered with by defendants.

Defendants in their papers try to claim that there is no express or implied right of contract. Def. Brief at 8. First, this is false, as the ticket specifically refers to granting entry to the stadium for the "specified *NFL* game." Def. Brief at 8; Def. Ex. A [emphasis added]. Thus, there is a clear right of the ticketholder to attend an "NFL game", which, as is self-evident, is a game played according to NFL rules. Plaintiffs assert that this implied contract requires the game to be played according to NFL rules when, in fact, it is not

because the Patriots were systematically violating the rules over a multi-year policy.  (Defendants contention that on-field penalties are similar to the systematic cheating alleged in the complaint is absurd: referees police on-field violations and the rules contemplate specific penalties for these violations; such are a normal part of the game and an implied part of the ticketholder's "license"; the systematic cheating and rule breaking manifested by the Patriots' management and their coach at issue in this case is fraud not contemplated as an "on-field" event in the ordinary course of play.)

Defendants' further claim that the contract was fulfilled because the plaintiff was granted entry to the stadium is also absurd.   Would defendant contend that if plaintiff purchased tickets to a professional football game, was admitted, and then witnessed two high school teams play that his contract rights had been honored?

The degree to which defendants interfered with plaintiffs' season tickets express, implied or quasi-contract rights or other economic benefit is a matter of fact that can't be decided on a motion to dismiss and therefore defendants motion must fail.

B. <u>Count II States A Cause of Action For Common Law Fraud</u>.

      i.     *Courts uphold common law fraud claims when football season ticket holders are misled.*

In *Beder*, an Ohio court held that a class of season ticket holders of the Cleveland Browns could maintain an action for common law fraud under Ohio law.   Plaintiffs in *Beder* claimed that the Art Modell, an owner of the Browns football team, misled season ticket holders by claiming that the team would not move from the city of Cleveland and then subsequently moving them to Baltimore.

The *Beder* court relied on the elements of Ohio common law fraud which are almost precisely the elements of New Jersey common law fraud:  (1) a false representation concerning a fact, (2) knowledge of the falsity of the representation or utter disregard for its truthfulness, (3) intent  to induce reliance upon the representation, (4) justifiable reliance upon the representation, and (5) injury proximately caused by the reliance. *Beder* at 195 citing *Gaines v. Preterm-Cleveland, Inc.* (1987), 33 Ohio St. 3d 54, 55, 514 N.E.2d 709; *Mussivand v. David* (1989), 45 Ohio St. 3d 314, 322, 544 N.E.2d 265; *Burr v. Stark Cty. Bd. of Commrs*. (1986), 23 Ohio St. 3d 69, 73, 491 N.E.2d 1101.

Plaintiffs in *Beder* relied on two newspaper articles wherein Modell was quoted as unequivocally stating that he would not move the team as long as his family owned it. Appellants claimed they relied on these statements in purchasing their season ticket packages:

> Art Modell, in an interview last week with Plain Dealer editors and reporters, vowed the team will stay in Cleveland as long as his family owns it. And he said the franchise is not for sale, either.

Modell is quoted as further saying:

> I'm not about to rape this city as others in my league and others have done (to other cities)," he said.

> You'll never hear me say, 'If I don't get this I'm moving.' You can go to press on that one. I couldn't live with myself if I did that,' he said.

The Browns contended that statements appearing in a newspaper article cannot serve as a basis of a fraud claim because it would be unfair to draw an inference of fraud from a statement appearing in a news article over which defendant had less than complete control. The *Beder* court rejected this argument, stating:

> [T]he facts and circumstances surrounding this case compel this court to respond in a manner cognizant of the nonconventional means of communication between a sports franchise and its season ticket holders. We recognize, as the Browns apparently cannot, that it would be unreasonable to expect the Browns' owners and managers to communicate directly with each and every season ticket purchaser and state their intentions regarding the future of the team. To the contrary, as is customary in the industry, the owners and managers communicate through the media, both as to the team's performance and its anticipated future, with the hope of inducing potential purchasers to purchase tickets and season ticket

packages. This being the case, we decline to discount
the significance of the news articles insofar as they
attempt to satisfy the reliance element of appellants'
fraud claim. Appellants claim that the representations
contained in the news articles were false and the
Browns knew they were false when made. Further,
they contend that the statements were made with the
intent to induce potential season ticket holders, such
as appellants, to purchase tickets and that they did so
to their detriment…. Thus, we find that summary
judgment was inappropriately granted on appellants'
claim of fraud.   *Beder* at 199-200.

If statements by Modell in *Beder*, can serve as the basis for a fraud

claim, there is no doubt that misrepresentations or omissions from the Patriots

and from the Patriots to the effect that they were playing the game within NFL

rules, or concealing their intent to violate the fundamental rules of the NFL,

can serve as a basis for a fraud claim in this case. Whether the Patriots

statements or omissions amount to fraud is for the jury and can't be decided on

a motion to dismiss.

In *Charpentier v. Los Angeles Rams Football Company, Inc.,*  75 Cal.

App. 4th 301; 89 Cal. Rptr. 2d 115(Cal. Ct. of Appeals, 4th Appel.Dist. 1999)

another class of season ticket holders brought a similar action against the Rams

football team for misleading season ticketholders about the team's move to St.

Louis.   Id. at 312.

The *Charpentier* court applied the California law of common law fraud that is again almost exactly identical to the New Jersey standard, holding that the tort of deceit or fraud requires: " ' "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' "Id. citing *Engalla v. Permanente Medical Group, Inc*. (1997) 15 Cal. 4th 951, 974, 64 Cal. Rptr. 2d 843, 938 P.2d 903.

In its decision the court made clear that the question of whether misleading statements were material to the plaintiff was for the jury:

> We think the allegations of fraud were sufficiently detailed, as well. Defendant cannot persuasively complain it misunderstands the fraud claim made here. If, as it complains, it is confused as to who made the representations and by what means, a little discovery should clear that up. Whether a reasonable fan deciding to purchase season tickets would attach weight to representations concerning a team's moving prospects after the season for which he or she is buying tickets is up to the jury to resolve, not us. That there is such an expectancy and it was fostered here by the Rams is what plaintiff pleads, and the out-of-state cases cited by the parties virtually all recognize such a reasonable expectancy as a feature of large-scale spectator sports businesses. We think a jury could properly find that many fans, knowing the Rams were planning to decamp in 1995, would have chosen to cut their losses in 1994, rather than sign on for another losing season. And assuming the Rams did prevaricate concerning a return in 1995, a reasonable

> jury could certainly find the team sold more season
> tickets in 1994 than it would have had it candidly
> announced the coming move, or at least that plaintiff
> would not have elected to spend money "waiting until
> next year." If the defendant misled folks to believe the
> team was not leaving town to induce them to buy
> tickets to see another poor team in its last season,
> plaintiff's claim in a nutshell, it not only deserves to
> lose this case, an economist could explain why it
> should hope to lose. Charpentier at 124.

According to the Restatement of Torts, "[r]eliance upon a fraudulent misrepresentation [or omission] is not justifiable unless the matter misrepresented is material.  . . . The matter is material if  . . a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . . ." (See Rest.2d Torts, § 538.) But materiality is a jury question, and a "court may [only] withdraw the case from the jury if the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." (Id., com. e, p. 82.)  Such finding cannot be made in the instant case.

Here it is a question of fact what fraudulent statements or omissions the Patriots made to induce fans to purchase tickets on the assumption that games with the Jets would be competitive when in fact the Patriots had rigged the game.  Whether the Patriots made the omissions or misrepresentations as part of

the Jets contracts with ticket holders (because the Patriots share the revenues from the ticketholders) or because they were a third party as in *Beder*, an action for fraud lies.

### ii. Plaintiffs adequately pled fraud under New Jersey law.

To succeed on a claim for fraud in New Jersey, a Plaintiff must establish the following five elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Wartsila NSD North America, Inc. v. Hill Intern., Inc.,* 342 F. Supp. 2d 267, 287-88 (D.N.J. 2004) (citing *Gennari v. Weichert Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (1997)).

Plaintiff specifically alleges that "Defendants did so for their own private benefit..." Cmplt., ¶ 63; Cmplt.,¶ 110.  The complaint also alleges the economic motive behind the Patriots dishonesty: "Meanwhile, Jets fans have collectively spent well over $61 million on tickets to watch eight supposedly honest, competitive games between the New York Jets and New England Patriots between 2000 and 20007. Counts I through VIII of this Complaint seek damages and restitution for ticketholders from defendant New England Patriots

24

and Bill Belichick for the money spent on games that were systematically and illegally tainted by the actions of defendants…" Cmplt., ¶ 21.

The complaint also sets forth in substantial detail and particularity regarding the lengths to which defendants went to engage in fraud and conceal their efforts.  Cmplt. ¶¶ 22-42.  Plaintiffs have met, contrary to defendants allegations, the pleading requirements for the NJCFA and for Rule 9(b) which is implicated when fraud is pled under the NJCFA.

The complaint alleges in detail how fraud was built into the Patriots organization, how there was one assistant in charge of surreptitiously videotaping such that he was instructed to "conceal his actions and misrepresent his activities if challenged. Such instructions demonstrate a consciousness of wrongdoing by the Patriots' management and an intent [emphasis added] and plan to keep the taping program secret from ticketholders and competing teams." Cmplt.,¶ 33.

The complaint contains enormous detail about the length the Patriots organization went to instruct Matt Walsh, the person hired specifically to steal signals from opponents via video, how to conceal his fraudulent efforts:

> 34. If challenged by an opposing team as to his use of a third video camera on the field, Walsh was instructed to say that he was filming "tight shots" or "highlights".

35. The red operating light on Walsh's camera was
intentionally broken to conceal the fact of camera
operation.

36. Walsh was told that if asked why he was not
filming action on the field, he was to say he was
filming the down marker.

37. Walsh's was told not to wear a Patriots logo
during his filming of the Steelers signals
during the American Football Conference 2002
championship game.

38. These admissions by Walsh were disclosed by
United States Senator Arlen Spector who interviewed
Walsh and by Walsh in disclosures published by the
New York Times.

C. Count V: A Federal RICO Complaint is Adequately Pled.[7]

First, the complaint adequately pleads reliance on the Patriots' omissions

and intent by the Patriots. Cmplt. at ¶¶ 75,76,77.

Second, direct reliance on the misrepresentation is *not* a requirement for a

cause of action under §1962(c) as long as the mails or interstate wires were

sued "for the purpose of executing such scheme or…attempting so to do."

*Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2138 (2008).  As

---

[7] As New Jersey racketeering laws generally follow federal RICO practices, as
set forth below in Point C, above, the predicate acts for common law fraud,
deceptive business practices and consumer fraud, along with the deception set
forth in the Complaint, establish a well-pleaded basis for claims under the New
Jersey racketeering statutes.  Complt. at ¶85-92.

*Bridge* recognized, "one can conduct the affairs of a qualifying enterprise through a pattern of such acts *without anyone relying on a fraudulent misrepresentation." Id. at 2138 [emphasis added]*:

> If petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement.  Using the mail to execute or  attempt to execute a scheme to defraud is … a predicate act of racketeering under RICO, even if no one relied on any misrepresentation. See Neder v. United States, 527 U.S. 1, 24-25, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) ("The common-law requiremen[t] of 'justifiable reliance' . . . plainly ha[s] no place in the [mail, wire, or bank] fraud statutes").

> It thus seems plain…that no showing of reliance is required to establish that a person has violated §1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud. See Anza, 547 U.S., at 476, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (Thomas, J., concurring in part and dissenting in part) ("Because an individual can commit an indictable act of mail or wire fraud even if no one relies on his fraud, he can engage in a pattern of racketeering activity, in violation of §1962, *without proof of reliance*").

*Bridge v. Phoenix Bond & Indem. Co.,* 128 S. Ct. at 2138-2139 [emphasis added].

Bridge based its holding of a non-reliance construction of §1962(c) from the text of §1964(c) which "states simply that '[a]ny person injured in his business or property by reason of a violation of section 1962' may sue for treble

damages." *Bridge, supra*.  Such "breadth of coverage", the Court held, is " not easily reconciled with an implicit requirement that the plaintiff show reliance in addition to injury in his business or property.  *Id.*

As *Bridge* rejects a "reliance" requirement in §1962(c) claims, defendants' assertions that no racketeering claim arises because their omissions did not induce reliance by ticketholders is simply wrong. To the contrary, under Bridge, the most recent statement by the Supreme Court on §1962(c) liability, Plaintiff need only plead that he and other ticketholders were deprived of the value of tickets paid as a result of a pattern of racketeering activity, namely the multi-year concealment by the defendants of the Patriots' theft of competitors' signals and plays that deprived ticketholders of the primary object of their purchase: attendance at games run according to NFL rules subject to the understanding that each team plays a strategic and tactical game without foreknowledge of their opponents' plays.  By using the mails and the interstate wires as an element in the operation of the scheme, the Patriots and co-defendant Belichick caused injury to ticket purchasers who were deprived of the fundamental value of their purchase.  Cmplt. at  ¶¶65-81. As *Bridge* expressly holds, it is the injury to the victim that is the operative fact - no requirement

exists that the victim rely on the actual mail or wire fraud in actions arising

under §1962(c). [8] *Bridge, supra* at 2138-2139.

    *Bridge* even went so far as to hold that a claim sounding essentially in

"tortious interference", a traditional state law remedy, is well-within the scope

of Congress' construction of actions under §1962(c) and saw no danger of "the

'over-federalization' of traditional state-law claims." *Bridge* at 2145.

("Whatever the merits of petitioners' arguments as a policy matter, we are not at

liberty to rewrite RICO to reflect their—or our—views of good policy.").

    As a claim of tortious interference with Jets ticketholders rights is the

precise factual setting of the instant case, it is self-evident that a viable claim

under §1962(c) has been pled at the threshold.[9]  See Cmplt at ¶¶59-64,102-106.

---

[8] In any event, Plaintiff has, though he need not under *Bridge*, pled that he and other ticketholders were expressly injured by an intentional omission or misrepresentation,  Cmplt. at ¶¶72,73,75,76, 77, thus additionally supporting the basis of his claims under §§1962(a)(b) and (d), as well as his common law fraud claims.

[9] Such construction is directly consistent with *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 252, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994) where the Court noted the liberal test for reviewing pleadings at the threshold in an action arising under §1962(c).  "We have held that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Scheidler* at 256, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992) (citations omitted).  Scheidler at 256.

Moreover, the Supreme Court has repeatedly insisted on ascribing a

broad scope to RICO actions including non-traditional enterprise and motive

allegations.  As the Court reiterated in *Bridge*, "We have repeatedly refused to

adopt narrowing constructions of RICO in order to make it conform to a

preconceived notion of what Congress intended to proscribe."  *Id.,* citing

*National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 252, 114 S.

Ct. 798, 127 L. Ed. 2d 99 (1994) (rejecting the argument that "RICO requires

proof that either the racketeering enterprise or the predicate acts of racketeering

were motivated by an economic purpose"); *H. J. Inc. v. Northwestern Bell*

*Telephone Co.,* 492 U.S. 229, 244, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)

(rejecting "the argument for reading an organized crime limitation into RICO's

pattern concept"); *Sedima, S. P. R. L. v. Imrex Co.,* 473 U.S. 479, 481, 105 S.

Ct. 3275, 87 L. Ed. 2d 346 (1985) (rejecting the view that RICO provides a

private right of action "only against defendants who had been convicted on

criminal charges, and only where there had occurred a 'racketeering injury'").

In *Scheidler*, 510 U.S. at 252, the Court recognized that §1962(c)

contains no requirement that the motive of the scheme be "economic" in nature:

> "We granted certiorari to determine whether RICO requires proof that
> either the racketeering enterprise or the predicate acts of racketeering
> were motivated by an economic purpose. We hold that RICO requires *no*
> *such economic motive*. "Id.  [emphasis added].

Thus, the implied, if not directly stated, argument of defendants that the Patriots

and Belichick engaged in no economic offense but merely violated the rules of

a "game", is of no moment in determining liability under section 1962(c) which

requires no "economic motive" and embraces a wide variety of other schemes.

*Id.*

Similarly, there is no synthetic limitation to the "enterprise" requirement

under §1962(c).   See e.g.  *United States v. Turkette*, 452 U.S. 576, 69 L. Ed. 2d

246, 101 S. Ct. 2524 (1981), ( "there is no restriction upon the associations

embraced by the definition: an enterprise includes any union or group of

individuals associated in fact.").  452 U.S. at 580.

In *H. J. Inc. v. Northwestern Bell Tel. Co*., *supra,* a case substantially

analogous to the instant action, the Supreme Court recognized that phone

subscribers had standing to seek racketeering damages against a phone

company that sought to bribe members of a public utility commission to

increase rates.  Rejecting the district court's holding that each of the asserted

bribes was a separate scheme to defraud, the Supreme Court held that the

continued six year pattern of bribes comprised a pattern with the necessary

relatedness and continuity with the necessary "long term" continuity.   492 at

249-250.

As in *H.J., Inc.* the complaint pleads the necessary relatedness and continuity to meet the threshold pattern requirement. Patriots and Belichick engaged in the scheme to steal signals and plays for at seven years beginning in 2000 and ending in 2007 when they were caught by Jets officials.  Cmplt. at ¶¶22,24,37,41,42,32.  The continued concealment of such facts from ticketholders took place through the league over a period of seven years on dozens of occasions and were a habitual part of the Patriots' business.  See generally Complaint at ¶¶15-32.

As there is no definitional limitation on an "enterprise", *United States v. Turkette,* 452 U.S. at 580, it is equally clear that the complaint pleads enterprises whose affairs were manipulated by defendants Patriots and Belichick through a pattern of racketeering activity.  By engaging in a continuing and apparently open-ended pattern of theft of signals and concealment with respect to opponents throughout the NFL, the Patriots and Belichick manipulated the NFL as a racketeering enterprise.  By directing his team's affairs through the use of stolen signals and concealment of such actions, defendant Belichick manipulated the affairs of the Patriots as a racketeering enterprise.  And, finally, with respect to the use of stolen signals against the Jets over a period of seven years, Cmplt. at ¶21, the Patriots and Belichick, by

agreeing to compete against the Jets with stolen information concealed from Jets ticketholders, manipulated the Jets as a racketeering enterprise.

These pattern, continuity and enterprise tests are as equally applicable to Plaintiff's §1962(a) and (b) claims as to plaintiff's §1962(c) and (d) allegations. By any reasonable standard plaintiff had pled a claim arising under the RICO statutes.

D. Count VI: States A Cause of Action For Violation of Plaintiff's Third Party Beneficiary Rights.

Defendants ask for an impossibility in attempting to get this court to dismiss plaintiff's claim for its violation of third party beneficiary rights. Defendants assert that the complaint "does not identify any particular contract, or even the parties to any such a (sic) contract, to which plaintiff is an intended third-party beneficiary."

First, this is untrue in that plaintiff specifically identifies the parties to contracts that confer third party beneficiary rights on plaintiffs.  The complaint specifically alleges "Plaintiff and other class members is an intended third party beneficiary of the contracts between the New York Patriots and the New York Jets and/or the NFL." Cmplt., ¶ 103.  The complaint pleads contracts between the Jets and the Patriots and/or the Jets and the NFL. Cmplt. at ¶¶103-105.

To require plaintiffs to identify the precise terms and nature of the contracts would be an impossibility as those contracts are in the possession of

the Jets, the Patriots and the NFL.  This is what discovery is for and having pled

the existence of the contracts, the plaintiffs must have the opportunity to review

them in discovery and prove that fans/consumers are third party beneficiaries of

the revenue sharing agreements that are standard in the NFL and in other

professional sports leagues. It is generally known that the NFL, like other sports

leagues, shares revenue amongst all teams and that each team gives a

percentage of ticket sales to the visiting team, in the case of the NFL roughly

40%.[10]  But the precise terms of the presumably elaborate contracts and revenue

sharing arrangements could only be determined in discovery.  Having pled such

contracts, Plaintiff is entitled to proceed from the threshold.


E. <u>Count VII States A Cause Of Action For Breach of Contract.</u>

Plaintiffs have also adequately pled that they are in a quasi-contractual

relationship with the New England Patriots: "Plaintiffs plead in the alternative

that they have an implied or quasi contract with the New England Patriots who

violated such contract by illegally recording and capturing the New York Jets'

coaching and player signals."  Cmplt.,¶ 108.

---

[10] D. Surdam, "A Tale of Two Gate-Sharing Plans: the National Football League
and the National League, 1952-1956"  Southern Economic Journal, April 2007

This quasi-contract exists because of the revenue sharing arrangements of the NFL.  Because the Patriots take 40% of the revenue from every game played against the Jets in the Giants Stadium in the Meadowlands under contract with the Jets and with the NFL, the defendants derive a benefit from plaintiffs.   This is all that needs to be alleged under New Jersey law.  *Iliadis v. Wal-Mart Stores, Inc*., 191 N.J. 99 (2007) .  See also *Cohen v. Home Ins. Co*., 30 N.J. Super 72 (App.Div. 1989)("It is consequently only necessary for plaintiff to prove that defendant received a benefit from plaintiff which it is unjust for him to retain without compensation, and that plaintiff, in conferring the benefit expected remuneration.")

Plaintiff conferred the benefit on the Patriots of paying more than $400 to see games the Patriots play in Giants Stadium - the Patriots receive 40 per cent of that revenue.  Implied in the quasi-contract is that the Patriots will play according to NFL rules and plaintiff will witness a legitimate game.   Plaintiff alleges that the defendants were unjustly enriched under this quasi-contract, stating "Defendants did so for their own private benefit..." Cmplt.,¶¶ 63,107.

F. Count VIII States A Claim That Defendants Violated The New Jersey Consumer Fraud Act.

The NJCFA provides, in relevant part, that "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud,

false pretense, false promise, misrepresentation, or the knowing, concealment,

suppression, or omission of any material fact with intent that others rely upon

such concealment, suppression or omission, in connection with the sale or

advertisement of any merchandise or real estate, or with the subsequent

performance of such person as aforesaid, whether or not any person has in fact

been misled, deceived or damaged  thereby, is declared to be an unlawful

practice." N.J.S.A. § 56:8-2. The NJCFA creates three categories of unlawful

practices: affirmative acts, knowing omissions, and violations of state

regulations. Cox v. Sears Roebuck & Co., 138 N.J. 2, 647 A.2d 454, 462

(1994). Affirmative acts of fraud require no showing of intent on behalf of the

defendant. See Cox, 138 N.J. 2 at 17, 647 A.2d 454; Fenwick v. Kay Am. Jeep,

Inc., 72 N.J. 372, 378, 371 A.2d 13 (1977). See also Skeer v. EMK Motors,

Inc., 187 N.J.Super. 465, 455 A.2d 508 (App.Div.1982). Thus, a defendant who

makes an affirmative misrepresentation is liable even in the absence of

knowledge of the falsity of the misrepresentation, negligence or the intent to

deceive. Strawn, 140 N.J. at 60, 657 A.2d 420. In contrast, when the alleged

consumer fraud consists of an omission, a plaintiff must show that the

defendant acted with knowledge, thereby making intent an essential element of

the fraud.  See Cox, 138 N.J. at 18; Chattin v. Cape May Greene, Inc., 124 N.J.

520, 522, 591 A.2d 943 (1991) (Stein, J. concurring).

*i. The complaint properly alleges that defendants violated the New Jersey Consumer Fraud Act by deceiving plaintiff and other fans in connection with the sale of tickets.*

Defendants first argument is that "[t]here is no allegation – nor could there be – that the Patriots had any involvement in the sale or advertisement of tickets to the plaintiff."  Def. Br. At 25.  The standard under the NJCFA is only that there be deception "in connection with" which is a broader standard than defendants claim of "involvement in the sale or advertisement of tickets".  Under either standard, however, the complaint in fact pleads that defendant Patriots were engaged in deception for their own economic benefit: defendants hid the fact that they were rigging the games in order to induce Jets fans and others to purchase tickets to games that were supposedly honest and played according to NFL rules and, as shown herein, in which the Patriots receive at least 40 per cent of the ticket sales.  The complaint plainly states that "[d]efendants conduct violated the New Jersey Consumer Fraud Act (citations omitted) by committing a fraud, deception, misrepresentation, unconscionable business practice, concealment, suppression and omissions in conducting their business in the State of New Jersey." Cmplt.,¶ 111.  Plaintiff specifically alleges that "Defendants did so for their own private benefit..." Cmplt. ¶¶ 63, 110.  As is undisputed, the Patriots shared the Jets' ticket revenues; as such all of the various frauds and misrepresentations in violation of the NJCFA were

committed "in connection with" the sale of merchandise: i.e. tickets. "Plaintiff and other class members is an intended third party beneficiary of the contracts between the New York Patriots and the New York Jets and/or the NFL." Cmplt., ¶ 103.   It is undisputed that defendants did not disclose their scheme to steal Jets signals and omitted the truth of such facts.  It is thus a question of fact as to what efforts defendants took to conceal their misrepresentations from Jets fans thereby inducing them to purchase tickets and pay money that went to defendants coffers; therefore, defendants motion to dismiss must be denied.

   ii.   *Plaintiffs properly allege an intent to induce purchase under the NJCFA.*

   Defendants second claim is that the complaint does not allege that when the Patriots engaged in unlawful videotaping that they were "trying to induce New York Jets fans to buy tickets to the games at issue."

   Of course the obvious answer is that the Patriots and their coach could not have been engaged in a massive, organization wide effort to the violate NFL rules for any other reason than to win games contrary to the rules and therefore make money from fans who are induced to buy tickets to what they thought was an honest game played according to the rules but were in fact paying money to view an undisclosed rigged game.   What reasonable fan would pay a nickel to watch a game where one team knows in advance what plays the other team is going to run?  More importantly, the complaint pleads exactly that.

Plaintiff specifically alleges that "Defendants did so for their own private benefit..." Cmplt.,¶¶ 63, 110.  The complaint also alleges the economic motive behind the Patriots dishonesty: "Meanwhile, Jets fans have collectively spent well over $61 million on tickets to watch eight supposedly honest, competitive games between  the New York Jets and New England Patriots between 2000 and 20007. Counts I through VIII of this Complaint seek damages and restitution for ticketholders from defendant New England Patriots and Bill Belichick for the money spent on games that were systematically and illegally tainted by the actions of defendants…" Cmplt.,¶ 21.

The complaint also sets forth in detail and particularity regarding the lengths to which defendants went to engage in fraud and conceal their efforts. Plaintiffs have met, contrary to defendants' allegations, the pleading requirements for the NJCFA and for Rule 9(b) which is implicated when fraud is pled under the NJCFA. Cmpl. pp. 22-42.  The complaint alleges in detail how fraud was built into the Patriots organization, how there was one assistant in charge of surreptitiously videotaping such that he was instructed to "conceal his actions and misrepresent his activities if challenged. Such instructions demonstrate a consciousness of wrongdoing by the Patriots' management and an intent [emphasis added] and plan to keep the taping program secret from ticketholders and competing teams." Cmplt. ¶ 33-38.

iii.     *The complaint properly pleads a causal nexus between the defendants cheating and the economic damages to plaintiff.*

Without any support, defendants flail about, desperately asserting: "the Patriots' alleged videotaping has no "direct relation" to damages alleged by plaintiffs.  Apart from the inference that it is obvious that reasonable Jets fans/consumers would not likely pay to watch a game where one team knew the signals of the other team in advance, the complaint does, in fact, plead the nexus between the videotaping and the damages suffered by plaintiff.

Plaintiff specifically alleges that "Defendants did so for their own private benefit..." Cmplt.,¶¶ 63,110.  The complaint also alleges the economic motive behind the Patriots dishonesty: "Meanwhile, Jets fans have collectively spent well over $61 million on tickets to watch eight supposedly honest, competitive games between  the New York Jets and New England Patriots between 2000 and 20007." Cmplt.,¶ 21.  It is thus not surprising that in *Beder*, the Ohio appellate court ruled that a class of football season ticket holders could maintain an action under the Ohio Consumer Sales Practices Act, a statute very similar to the New Jersey Consumer Fraud Act. See *Beder* at 197-198.  Here, as in *Beder*, defendants' "summarily asserted" claims, *Beder, supra*, that plaintiffs have not pled violations of the NJCFA must fail.

## VI.   CONCLUSION

For all of the foregoing reasons, plaintiff respectfully requests that

defendants motion to dismiss be denied.

Respectfully submitted,


S/Bruce I. Afran

**BRUCE I. AFRAN, ESQ.**
10 Braeburn Drive
Princeton, NJ 08540
Telephone : (609) 924-2075
Facsimile: (609) 924-1045

-and-

Carl J. Mayer, Esq.
**MAYER LAW GROUP LLC**
66 Witherspoon Street, Suite 414
Princeton, NJ 08542
Telephone:  (609) 921-8025
Facsimile:  (212) 382-4687


Attorneys for Plaintiffs

December 31, 2008